THE SARNIA. THE ROBERT PALMER. THE E. T. DALZELL.

(District Court, E. D. New York. April 9, 1918.)

COLLISION &=71(2)—STEAMER ENTERING SLIP AND MOORED VESSEL—FAULT.

A collision between a steamer, being warped into a slip with her own steam and the help of two tugs, under direction of the master of one of the tugs, and a lighter moored on the opposite side of the slip, held due to the fault of the steamer and one of the tugs.

In Admiralty. Suit for collision by the Wright & Cobb Lighterage Company, owner of the lighter Crescent, and others, against the steamer Sarnia, the Sarnia Steamship Corporation, claimant, with the tugs Robert Palmer and E. T. Dalzell, impleaded. Decree for libelant against the Sarnia and Palmer.

Foley & Martin and J. A. Martin, all of New York City, for libelant.

Hunt, Hill & Betts and George W. Betts, Jr., all of New York City, for the Sarnia.

Burlingham, Montgomery & Beecher and Chauncey I. Clark, all of New York City, for tugs Barrett, Palmer, and Dalzell.

CHATFIELD, District Judge. This action is brought for damages caused in the sinking of the lighter Crescent, on the northerly side of Pier 5, Brooklyn, on the afternoon of June 9, 1916. The Crescent had been towed to this pier in the morning and made fast a little inside of the end of the pier. She was loaded with cement and fastened by four lines. Her captain testifies that he was in the cabin of the vessel at the time, and that these lines had not been shifted nor the boat moved prior to the accident. The deckhouse on the Crescent floated off as she sank, and the collision injury, as shown by the pictures, consisted of a straight up and down gash a few feet forward of the stern on the port side of the vessel. This injury was evidently caused by the stem of the steamer Sarnia, and the mode of happening is not seriously in dispute. The Crescent's bowlines broke and the boat moved inshore, so as to free her from contact, and so as to allow the Sarnia to rotate away from the point of impact as soon as her own headway was checked. The issue turns upon responsibility for the movements of the Sarnia.

---

&=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The Sarnia, which is over 300 feet long, had come up from Bedloe's Island. The tide was still running flood, and the captain of the tug Palmer, who was in charge of the docking, was on the bridge in command of the vessel. The Sarnia went up the river beyond the Brooklyn Bridge, where she turned to come down against the flood tide and make a landing on the end of Pier 4. At this time the tug Palmer took her position with her stem against the starboard bow of the Sarnia, while the tug Dalzell came under the port quarter of the Sarnia, in order to shove the stern down stream against the flood tide. All witnesses except the captain of the Palmer, who was on the bridge of the Sarnia, estimate the flood tide to have been running with considerable strength, and to have made necessary the presence and working of the Dalzell in order to swing the stern of the Sarnia, which was projecting out into the tide.

A line was made fast to the southwesterly corner of the pier and another line extended some 200 feet from the bow of the Sarnia to the third mooring spile on the south side of the pier. The vessel was thus lying at an angle of about 45 degrees across the southwesterly corner of Pier 4. In this position both the Dalzell and the Palmer exerted forces which would turn the vessel or warp her around the corner of the pier, but which at the same time would move her forward in the slip, if not so applied as to be limited to a rotating motion. All the witnesses testify that the Sarnia did proceed ahead as she swung into the slip until she struck the lighter on her port side. The vessel continued to swing and to move ahead as she cleared the lighter, until she moved into her berth on the south side of Pier 4.

The action is brought by the owner of the lighter against the Sarnia, which has impleaded, under rule 59, the owner of the tugs Dalzell and Palmer. The captain of the Sarnia was absent at the time, but the other officers of the vessel were on duty on her bridge and at the bow. The actual orders for the movement of the ship were given by the tug captain in charge of the docking, and the witnesses for the Sarnia claim that he miscalculated the distance which the Sarnia would require for the turn when moving ahead after rounding the end of the pier, and after her crew began to haul upon the line which ran from the bow of the vessel.

The tug captain testifies that the lighter was away from the pier at one end, and that he had an impression that the lighter was being moved; but this idea on his part seems to be unfounded. The slip is 170 feet wide, the lighter was about 30 feet wide, and the bow of the Sarnia was about 20 feet away from the lighter when the first officer of the Sarnia, stationed right at her bow, gave a warning to the pilot and to the third officer, who were upon the bridge, that they were getting too close to the lighter.

The testimony of the witnesses and the engineers shows that the engines of the Sarnia had been reversing and going ahead at short intervals ever since the vessel started to turn around above the Brooklyn Bridge. The collision is fixed in the neighborhood of 3:19 p. m. The third officer of the Sarnia and the tug captain testify that the Sarnia was then operating under a signal half speed astern. The tug captain

testifies that just at this moment, and as he thinks before the hail from the first officer, he gave the signal full speed astern to the engine room, but that the Sarnia continued to move ahead. He then repeated the full speed astern signal twice in succession, but gave no signal to either of the tugs, and the Sarnia did not lose her headway until she struck the lighter. The first officer of the Sarnia evidently also believed that the Sarnia did not respond to the signal to go astern, and has entered in his log that the pilot gave a signal to reverse, which was answered from the engine room, but that the engines went ahead.

There can be no question about the physical movement of the boat, but considerable dispute has arisen as to the actual operation of the engines. The chief engineer and his first assistant, who were in the engine room, spent some minutes inspecting a thrust block which had nothing to do with the movements of the engines, but took them away from where they could observe the telegraph or the writing of signals upon the blackboard. The second and third engineers and the oiler were receiving the signals, and one or the other of these assistant engineers was operating the levers, while the oiler wrote the orders upon the board. These were subsequently copied into a scrap log and the figures then erased from the blackboard. This was not done until after some question had been raised as to the collision. But there is nothing to indicate that the destruction of the original entries upon the blackboard was for any ulterior purpose, or that they were not correctly copied into the scrap log. The scrap log was taken up to the chief engineer, who had already written up his smooth log, and who did not change that, as the scrap log showed nothing contradictory. But the witnesses do not entirely agree as to just when and how these various writings were completed.

These incidental disputes are probably immaterial. The scrap log is in accord with the testimony of the witnesses that no series of three successive hard astern signals were received in the engine room. The tug captain testifies that he had given the order half speed astern before the Sarnia began to go ahead around the corner of the pier. If so, the engines of the Sarnia would be working with the tide, against the tugs, throwing her bow to starboard, as she was under a starboard helm, and setting her back the opposite way from which she wished to go. The pilot then testifies that, while the Sarnia's engines were still working half speed astern, he saw that the steamer was going ahead. He testifies that the telltale registered "astern" when he went and looked over the side at the quickwater, because he noticed that the steamer was sliding ahead along the dock. When he looked aft along the side, he and the third officer concluded that the engines were going ahead, although the only signal had been, as has been stated, a half speed astern. Then, according to the pilot's testimony, came the three signals for full speed astern, which either were not answered, or did not overcome the way of the Sarnia, before she covered the 20 feet and struck the lighter.

According to the testimony of the engineers of the Sarnia, her way could not be stopped within that distance, if she were proceeding at the rate of one knot an hour, which they all agree was about the rate of motion at which she was moving into the slip. But, further than this,

it seems apparent that the Sarnia was to a considerable extent con-trolled by the movement of the tugs. The Palmer was placed against the starboard bow of the Sarnia, and yet did not come in contact with the lighter, which the Sarnia struck almost at its farther end. The various witnesses for the Sarnia all agree that the Palmer was working at an angle not greatly off from a line parallel with the line of the Sarnia herself, and although the Palmer was undoubtedly working under a strong starboard helm, and with her screw so operating as to turn the Sarnia, there would be a decided forward thrust to the force which she was exerting upon the Sarnia. This would have to be taken into account in order to overcome the Sarnia's momentum. That this momentum was considerable is evidenced by the fact that the line run-ning from the Sarnia's bow, and upon which men were hauling with a winch, in order to pull her around into the slip, was pulled away from these men—that is, they were compelled to allow it to run out further —just before she struck the lighter.

It is evident that by the combined force of the tide, the tugs, and of the Sarnia's own engines (which by reversal threw her head to star-board) pressure was exerted against the corner of the pier, such that the Sarnia yielded in the only direction in which she could move, and went ahead, instead of rotating on a pivot, before she slid into the slip. It is difficult to see how the captain of the tugs expected to swing the Sarnia, and move her alongside the pier, without having her advance into the slip. In fact, it would not seem that he did so anticipate. He apparently expected her to swing more rapidly than she did, and thus he miscalculated the distance which the Sarnia would move ahead before she could be swung clear of the lighter. According to the testi-mony, the Sarnia was projecting beyond the pier some 80 or 100 feet at the time the maneuver started. When she struck the lighter, she was reaching across some 140 feet of water and had moved into the slip nearly 150 feet. As the Sarnia was over 300 feet long, there is nothing impossible in her so doing; but it shows conclusively that she was moving ahead at a considerable rate before the pilot realized that she was getting too close to the lighter.

The engine room force of the Sarnia testified that a partial move-ment of the signal lever might be insufficient to ring the gong, and that thus a half motion of the lever might not be heard. But it is impossible to see how a signal of half speed astern, followed by three full motions of the lever signal full speed astern, could be mistaken or misread by any one so as to be entered in the following form:

"Astern full 3:03 stop and ahead slow 3:04 astern full 3:05 stop and ahead 3:06 astern half 3:07 full 3:08 stop 3:09 ah half & stop 3:10 ast half 3:11 stop 3:12 ahead slow 3:13 stop 3:16 ah slow 3:17 stop 3:18 astern full 3:19 stop 3:19½ ahead slow 3:20 stop 3:20 ah slow 3:21 stop 3:22 ah slow 3:23 stop 3:24 ah slow 3:26 stop 3:28 ah slow 3:30 stop 3:32 ast slow 3:34 stop and all finish with engine at 3:35 p. m."

But, if three signals for full speed astern were given, they followed the time, at 3:19 p. m., when the pilot says that he saw the water going away from the ship and the ship going ahead, which was after the signals for half speed astern and full speed astern. According to this

testimony, the signal which was mistaken must have been his first full speed astern signal, and it is evident from the testimony of all the witnesses that then the Sarnia was but 20 feet away and her headway could not be stopped. But the third officer, who also says the signals to reverse were given, entered in the ship's log the following:

"1:59 p. m. anchor away slow astern  2:03 stop and half speed ahead  2:30 stop off end of Pier 4  3:15 alongside of dock warping ship into berth slow speed ahead  3:18 half speed astern and then full speed astern  telegraph answering astern but engine going ahead  Telegraph rung astern three times successively and answered from engine room but no change in engine  Tugboats J. A. Bouker on starb. hand and Edward Dalzell on port quarter  Ship colliding and sinking barge  3:30 finished with engines  3:45 ship all fast to dock."

He gives three-fourths of an hour off the end of the dock, and then starts the engines "slow speed ahead," which contradicts Capt. Slauer, the pilot. He also testifies that the engines seemed to go ahead, but he and Slauer were looking over the side, where the Palmer was working her engines ahead. Both the third officer and Slauer were surprised to see the boat moving ahead, either along the dock or through the water. Slauer immediately went back to ring the astern signals, and the third officer was watching the return signals from the engine room, so that neither of them had time, before the collision, which occurred immediately, to devote any more time to observing the quick water at the stern of the steamer. Evidently the steamer's way was stopped, and the log shows from 3:20 on nothing but "ahead" movements of the engines.

No one in the engine room knew of any collision until after going on deck, but the third assistant engineer, Vogel, testifies that he happened to notice upon the telegraph, after receiving the full speed astern signal at 3:19, a repetition of that signal, which did not ring the bell, which he describes as like a jingle bell, and in which the indicator did not move clear across the dial. At this time, according to his testimony, the first assistant engineer had returned from examining the thrust block and was working the engine. Vogel is the man who copied the entries from the blackboard into the scrap log. He copied these upon a page which had been prepared for the weather and other reports of June 10th and 11th, and copied them because the chief engineer was talking with the first assistant, and asked if any one had copied the entries from the blackboard. There is no explanation of why these entries were copied in the logbook, if, as Vogel says, he had no knowledge of the collision at the time. The log does not show the full astern signal, which Vogel says was received; that is, if there was one signal full astern, followed by a half signal which did not register, and then a third full astern signal, there should be at least two in the log. None of those on the stern deck of the steamer knew of the collision, and no one upon the tug Dalzell knew that a collision happened until after the steamer was docked.

No fault has been shown on the part of the lighter, and the libelant should recover damages and costs. The Sarnia has attempted to prove that the fault lay entirely with the captain of the tug Palmer, who evidently mistook the force of the tide, was in fault as to the movements

of the Sarnia when held to the corner of the dock by lines and by the pressure of the tide, who also failed to appreciate the effect of setting the Sarnia's engines astern when she was under a starboard helm and when she was bound by forces which restricted free movement, who allowed her to approach too close to the barge under the circumstances, and who failed to control the movements of the helping tugs, so as to prevent the collision.

But the Sarnia is in the position of having the burden of proof in support of her petition. If the engines of the Sarnia were operated under mistake, even to the extent of interpreting a full speed astern signal as a signal to stop, or if in any way Capt. Slaner's calculations were set at naught by some slip on the part of the engine room force of the Sarnia, it is impossible to hold that the Sarnia successfully bears the burden of showing that the entire blame for the collision should rest upon the tug captain. The production of a log written in an unusual way, after the event, contradicted by a log entry of the third officer, who stood on the bridge, and the conflicting testimony of the witnesses themselves, make it impossible to free the Sarnia, to the extent of holding that it has successfully passed all responsibility for the collision to the parties brought in by its petition.

No fault has been shown on the part of the tug Dalzell, and she and her owners should be released.

The libelant should have a decree for half damages and costs against the claimant of the Sarnia, and half damages and costs against the claimant of the Palmer.